FILED

02 JUL -9 AM 9:46

U.S. DISTRICT COURT
N.D. OF ALABAMA

**United States District Court**
**Northern District of Alabama**
**Southern Division**

**Huhtamaki Foodservice, Inc.,**

Plaintiff,

vs. CV-02-N-1485-S

**Georgia-Pacific Corporation,**

Defendant.

ENTERED
JUL 09 2002

**Memorandum of Opinion**

## I. Introduction

The court has for consideration the motion for preliminary injunction of plaintiff Huhtamaki Foodservice, Inc. (hereinafter "Huhtamaki"), filed June 19, 2002. (Doc. # 2).[1] Huhtamaki competes in the disposable plate industry under the trade name Chinet. Defendant Georgia-Pacific Corporation (hereinafter "Georgia-Pacific") competes in the same industry under the trade name Dixie. According to the plaintiff, Georgia-Pacific has over the course of the past several weeks created and caused to be disseminated on the various national television networks, a certain advertisement allegedly depicting the Chinet brand of disposable plate in a false and misleading manner. Such conduct, if actually established, would be actionable under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Specifically, the court would be authorized, and the plaintiff requests, that it, issue an injunction to prevent Georgia-Pacific from further disseminating the advertisement until such time

[1] Concurrently with its motion for preliminary injunction, Huhtamaki filed an application for temporary restraining order. This court denied that application on June 19, and set the matter for hearing on June 25, 2002. (Doc. # 5).



and under such conditions as the court may determine proper.[2] The court held a hearing in this matter on June 25, 2002, and upon due consideration, has determined that the plaintiff's request for interim relief is due to be **DENIED**.

## II. Background

### A. "Meatball"

The focus of this lawsuit is "Meatball," a television advertisement of some 15 seconds duration – essentially composed of four scenes. The first scene loudly and dramatically opens with two heaping paper plates of spaghetti and sauce side-by-side on a table; two microwave ovens are seen in the background; a high-pitched ring (ostensibly from the microwave ovens according to the plaintiff); music from an accordion; a male's voice (adorned with what is presumed to be an Italian-American voice) asking, "Which plate is stronger?"; a colorful Dixie logo beneath the plate on the

---

[2] In pertinent part, the Lanham Act provides,

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.
>
> (2) As used in this subsection, the term "any person" includes any State, instrumentality of a State or employee of a State or instrumentality of a State acting in his or her official capacity. Any State, and any such instrumentality, officer, or employee, shall be subject to the provisions of this chapter in the same manner and to the same extent as any nongovernmental entity.
>
> (3) In a civil action for trade dress infringement under this chapter for trade dress not registered on the principal register, the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional.

left of the table; the word Chinet in simple, white-faced type beneath the plate on the right-hand side of the table; and two lines of words in black type face at the bottom of the screen, which read: "Wet Strength. 1000W Microwave. 3:30 min. on high. Resting time 3:20 min. Food at 124 degrees." Def. Ex. # 8. Hands (whose corresponding bodies remain off-camera) slide the plates toward the viewer, and the male voice exclaims, "Hey, pass the meat balls!" Two scoops of meatballs suddenly appear on screen and are dumped unceremoniously atop the two piles of spaghetti and sauce. The hands then lift the plates into the air. The Chinet plate quite quickly collapses and drops its contents. The Dixie plate remains firm. The male voice returns and states, "Oh boy, there it goes." Then the scene shifts quickly to a living room setting, where the spaghetti is shown cascading down upon a khaki-clad leg (corresponding body again off-camera), then a shoe (with the male voice stating the obvious: "Oh no, not the shoe!"), and then – perhaps predictably – plush carpet of a whitish hue.

The advertisement then shifts back to the kitchen, with the plates still suspended above the table. Atop the still intact Dixie plate is the elephantine, but still steaming, serving of spaghetti, sauce and meatballs. From the Chinet plate, remnants of a similar spaghetti serving dangles and dribbles toward the table – still steaming. The Dixie logo and Chinet word remain beneath their respective plates. Beneath the Dixie logo in this scene, however, is the word Ultrastrong. The male voice returns to state: "Dixie is tougher than Chinet." Finally, as the male voice states, "Dixie, any tougher and its wouldn't be disposable"; the advertisement shifts to the last scene, with a screen-sized Dixie plate spinning to a stop, the Dixie logo superimposed upon it.

**B. Other Pertinent Facts**

According to the plaintiff, the plates were subjected to fairly extreme conditions. The plate testers piled more than 1.6 pounds of food (two-and-one-half times the generally recommended

serving) upon each plate; heated the food for 3:30 minutes in a high-powered microwave; and then allowed the plates and food to cool for 3:20 minutes. Furthermore, the Chinet plates subjected to this test apparently did not always perform as the plate depicted in the advertisement.[3] Of the thirty-seven takes from which the advertisers eventually culled the test footage used in "Meatball" (Take 20), Chinet plates collapsed immediately only 19 percent of the time (seven out of 37) and did not collapse16 percent of the time (six out of 37). In the 24 other takes, the plates collapsed at varying intervals (more than several seconds).

The plaintiff also claims that the "super" appearing at the beginning of the advertisement at the bottom of the screen fails to meet the industry standard set for such statements. Huhtamaki submits the affidavit of one Lori McGee, an associated broadcast producer in Nashville, Tennessee, whose professional duties include the corroboration of the type size (apparently referred to in the industry as "video scan lines") of supers on advertisements with the recommended standards set by the networks. According to Ms. McGee, the video scan lines of the Meatball super are 16 for uppercase letters and 14 for lower case letters. Huhtamaki contends that the standards of the major networks are between 24 and 18, depending upon whether the letters are upper or lowercase.

Huhtamaki also has submitted the results of a mall-intercept survey conducted at various shopping malls around the country. According to the plaintiff, the results of the survey indicate that individuals who view the Meatball advertisement interpret it as depicting a comparison of plate strength when the plates are being pulled directly from the microwave ovens. The viewers seemingly do not understand that the plates have been sitting and cooling for 3:20 minutes – a fact that renders

[3] The parties agree that the take depicted in the advertisement is Take 20, and that both plates performed for that take exactly as indicated without alteration.

the advertisement a test of the plates' wet strength, as opposed to their dry or general strength. The inability of the consumers to glean this fact, according to Huhtamaki, stems from a combination of factors: the super's inadequate size and brief on-screen presence (three to three and one-half seconds according to the plaintiff); and the sight of the plates being pushed toward the viewer as a ring from the microwaves sounds in the background. Huhtamaki also claims that the surveys indicate that a majority of viewers who see Meatball indicate they would choose Dixie over Chinet as a result of viewing the advertisement. Given the fact that Meatball is in wide national circulation – between May 28, 2002 and June 12, 2002, at least 24 million viewers nationwide had seen the advertisement – the harm resulting from Meatball's presence on the airways is apparent. Moreover, Georgia-Pacific has indicated that it intends to use Meatball for at least one year.

**III. Standard**

The issuance of a preliminary injunction is extraordinary remedy that may be done only if the plaintiff establishes by a preponderance of the evidence:

> (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction were not granted, (3) that the threatened injury to the plaintiff outweighs the harm an injunction may cause the defendant, and (4) that granting the injunction would not disserve the public interest.

*SunTrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1265 (11th Cir. 2001); *see also Horton v. City of St. Augustine*, 272 F.3d 1318, 1326 (11th Cir. 2001). As hereinafter explained, the court finds that the plaintiff has failed to carry its burden at least as to these first two elements.

**IV. Discussion**

In order to establish a right to relief under the Lanham Act, Huhtamaki must show

> (1) that the defendant made a false representation of fact about its own or another's product or services in commercial advertising or promotion; (2) that the statement

> actually deceived or has the tendency to deceive a substantial segment of its audience; (3) that the deception is material, in that it is likely to influence the purchasing decision; (4) that the defendant caused its false statement to enter interstate commerce; and, (5) that the plaintiff has been or is likely to be injured as a result of the false statement be a casually related diversion of sales or by a lessening of the goodwill associated with its products.

*BellSouth Adver. & Publ'g Corp. v. Lambert Publ'g*, 45 F. Supp. 2d 1316, 1320 (S.D. Ala. 1999), *aff'd without opinion*, 207 F.3d 663 (11th Cir. 2000). The Second Circuit, to whose precedent the plaintiff directs the court, recently phrased the inquiry in this manner:

> To establish a false advertising claim under Section 43(a), the plaintiff must demonstrate that the statement in the challenged advertisement is false. Falsity may be established by proving that (1) the advertising is literally false as a factual matter, or (2) although the advertisement is literally true, it is likely to deceive or confuse customers. However, in addition to proving falsity, the plaintiff must also show that the defendants misrepresented an inherent quality or characteristic of the product. This requirement is essentially one of materiality, a term explicitly used in other circuits. *See American Tel. & Tel. Co. v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1428 n.9 (3d Cir. 1994) (plaintiff alleging false advertising must prove "that the deception is material in that it is likely to influence purchasing decisions") (citations and internal quotation marks omitted), *cert. denied*, 115 S. Ct. 1838 (1995); *ALPO Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 964 (D.C. Cir. 1990) (false or misleading ads must be "material in their effects on buying decisions"); *Taquino v. Teledyne Monarch Rubber*, 893 F.2d 1488, 1500 (5th Cir. 1990) (deception must be "material, in that it is likely to influence the purchasing decision"); *see also* 3 McCarthy on Trademarks § 27:35 at 27-54 (there must be "some showing that the defendant's misrepresentation was 'material' in the sense that it would have some effect on consumers' purchasing decisions.").

*NBA v. Motorola, Inc.*, 105 F.3d 841, 855 (2d Cir. 1997) (citations and quotations omitted); *see also S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 238 (2d Cir. 2001). Furthermore, "in considering a false advertising claim . . . text must yield to context. . . . The entire mosaic should be viewed rather than each tile separately." *S.C. Johnson & Son*, 241 F.3d at 238; *see also Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 2002 U.S. App. LEXIS 9447, at *12-*13 (3d Cir. 2002) ("[O]nly an unambiguous message can be literally

false. The greater the degree to which a message relies upon the viewer or consumer to integrate its components and draw the apparent conclusion . . . the less likely it is that a finding of literal falsity will be supported."); *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997) ("When evaluating whether an advertising claim is literally false, the claim must always be analyzed in its full context.").

**A. Literal Falsity**

The plaintiff places heavy reliance upon *S.C. Johnson & Son*. In that case, the Second Circuit affirmed a district court's finding that an advertisement's depiction of a plastic bag's water-retention propensities was literally false, given that the advertisement overstated the actual risk and rate of bag leakage. *See S.C. Johnson & Son*, 241 F.3d at 240. Huhtamaki contends that Georgia-Pacific has similarly overstated the rate of failure of Chinet plates, given that "the Chinet plate does not spill food in 27.7 percent of these [video] 'takes.'" The court does not agree.

The parties offer a slew of contrary percentages to the court, none of which seem entirely consistent with one another. Those upon which the court chooses to proceed, therefore, are for better or for worse, those the court has gathered on its own accord. Plaintiff's Exhibit 2 and Defendant's Exhibit 1 contain video footage of 22 takes; that is, 22 instances where spaghetti, sauce and meatballs were placed on the plates and the plates were subjected to the test depicted in the advertisement. In takes 7, 10, 14, and 18, the Chinet plate appears to suffer some distortion under the weight of the pasta, but the pasta does not fall. In take 9, the Chinet plate suffers some distortion, and by the end of the take, spaghetti sauce is dribbling off the front of the plate. The seeming failure of the plate is slow, however, and the spaghetti never quite slides off the plate. In take 16, the plate appears to suffers a severe distortion, but the take is cut before the plate is lifted into the air. Thus,

considering only the 21 takes in which the plates are raised in the air, the Chinet plates hold their portions of spaghetti in either 19 percent or 23.8 percent of the takes, depending upon whether a "dribble" is equivalent to a "dump."

The significance of these numbers becomes more clear when the district court opinion in *S.C. Johnson & Son* is examined.

> It is my finding that the commercial in question has been shown by a preponderance of the evidence to be literally false in respect to its depiction of the flow of water out of the Slide-Loc bag.
>
> Now, I start with the idea that there is nothing wrong in Clorox giving a demonstration of how water flows out of a Slide-Loc bag. I find this despite the fact that there is no evidence whatever of any appreciable usage of a Slide-Loc bag to store water and no evidence at all that water would be stored in the manner shown in the commercial, that is, with the bag turned upside down.
>
> Having said that, it is nevertheless my view that care must be taken in such a demonstrative commercial to have reasonable accuracy, because as has been conceded by the defense and as has been testified by defendant's expert, the whole meaning of this commercial to a consumer is one of implication. No one literally does what is shown in the ad, that is, no consumer does that.
>
> I find that the commercial impermissibly exaggerates the facts in respect to the flow of water or the leaking of water out of a Slide-Loc bag. The commercial shows drops of water coming out of the bag at what appears to be a rapid rate. In fact, the rate is about one fairly large drop per second. Moreover, there is a depiction of the water level in the bag undergoing a substantial and rapid decline. Finally, there is an image of bubbles going through the water.
>
> I recognize that no viewer of the commercial would literally analyze the flow rate of the drops or literally and consciously calculate the drop in water level or understand much about the meaning of the air bubbles. But the overall impression, that is, the overall depiction in the commercial itself is of a rapid and substantial leakage and flow of water out of the Slide-Loc bag. This is rendered even more graphic by the fact that there is a goldfish depicted in the bag which is shown to be in jeopardy because the water is running out at such a rate. . . . However, the evidence as a whole shows that the amount of this leakage and the rate of this leakage in most cases is very small.

> The evidence shows that when these bags are subjected to the same kind of quality control test as used by Clorox for the Glad bags, there is some leakage in about two-thirds of the cases. However, the important thing for present purposes is that the great majority of those leaks are very small and at a very slow rate. And, again, it must be remembered that we are dealing with water in bags held upside down. Only in about 10 percent of these bags is there leakage at the rate shown in the commercial, that is, one drop per second.
>
> The problem with the commercial is that there is no depiction in the visual images to indicate anything else than the fact that the type of fairly rapid and substantial leakage shown in the commercial is simply characteristic of that kind of bag. There is nothing to indicate that that kind of leakage occurs in only a very small percentage of the bags. The so-called "super" in no way deals with the problem.
>
> I realize that if we were dealing with some product such as gravy or sauces, that might actually be stored in a Slide-Loc bag, a 10 percent chance of leaks at one drop per second would be something that a consumer might well worry about. But, of course, the 10 percent related to tests with water contained in Slide-Loc bags held upside down. These tests were performed to evaluate the accuracy of the portrayal in the commercial.
>
> Again, in my view, a demonstrative commercial such as this, which does not deal with any kind of normal consumer usage, should have the demonstration accurate. Accuracy is particularly important where the commercial directly compares competing products identified by brand name. However, the commercial greatly exaggerates the problem of water leakage in a Slide-Loc bag. I find, therefore, that in respect to what I just discussed the commercial is literally false.

*S.C. Johnson & Son v. Clorox Co.*, No. 99 Civ. 11079 (TPG), 2000 U.S. Dist. LEXIS 3621, at *1-*5 (S.D.N.Y. 2000). The differences between the facts of the instant case and the facts underlying *S.C. Johnson & Son* are readily apparent. First, the other takes filmed by the paper plate marketers matched or closely matched the take used in Meatball – Take 20 – 42.8 percent of the time. (Def. Ex. 1, takes 1, 2, 3, 6, 13, 15, 20, 21, and 22). That figure climbs to 76.2 percent when the court factors in the takes depicting spaghetti sliding from the plate at a rate slower than that captured in Take 20. Neither of these figures comes close to approximating the 10 percent figure discussed by the District Court in *S.C. Johnson & Son*.

The plaintiff argues that the difference in rate is important, given that a reasonable consumer would think to grab the plate with a second hand if the plate showed signs of succumbing to the weight of the food piled upon it. A consideration of the full context of the advertisement betrays this contention. Meatball opens with a single query: Which plate is stronger? Simultaneously appearing at the bottom of the screen is the super, seemingly to qualify the question posed. Granted the advertisers introduce these messages with a simultaneously flurry of visual and aural stimuli: music, a high-pitched ring, a male voice; the sight of hands sliding the plates of spaghetti forward, microwaves disappearing into the background, Dixie and Chinet labels. The question and the super, however, focus the point of the advertisement toward the resolution of single issue: *which plate is stronger under the conditions documented here*? It seems obvious to the court that this issue resolves itself with a consistency that renders Meatball distinct from the factual setting described *supra* in *S.C. Johnson & Son*. For unlike the 10 percent similarity witnessed there, the present case demonstrates that 75 percent of the time, Chinet plates perform as the Chinet plate depicted in Meatball, and fail to support the weight of the food topped upon them.

Contrary to the position taken by Huhtamaki, Meatball does not depict any extreme or even unusual use of the two paper plates. The plaintiff would make much of the large portions of food heaped upon the plates, but, as observed during the hearing, "recommended" food portions bear little resemblance to the real world of "biggie" and "super size" servings. Similarly, the means by which the plates were tested – lifted with one hand at the edge – does not constitute a use an average consumer would never use.

Finally, the court returns to the fact that Take 20 – the substance of Meatball–happened just as depicted. Take 20 would, of course, be of no relevance if it was an isolated or freak happenstance

among other contrary demonstrations. But as discussed *supra*, Take 20 generally typifies what happened when the two competing plates were subjected to the conditions depicted in Meatball. Based upon the foregoing, the court finds the advertisement not literally false within the meaning of the Lanham Act.

**B.     Likelihood of the Advertisement to Deceive or Confuse**

The plaintiff offers several arguments that go toward the advertisement's propensity to deceive or confuse. First, the plaintiff claims that individuals who view Meatball are misled into believing that the plates and their contents have just finished heating in a microwave. Fostering this misunderstanding are the advertisement's aural and visual signals: the high-pitched ring sounding at the outset; and the sight of plates moving away from the microwave and toward the viewer. The attempt of Georgia-Pacific to cure this confusion is futile, according to the plaintiff, because the average consumer cannot discern the super or its meaning. The super fails to appear for an adequate length of time, and employs fewer video screen lines than recommended by industry standards. As a result of these deficiencies, the average consumer is erroneously led to believe that a Chinet plate will collapse after food has been sitting on it only for the length of time necessary to reheat it in the microwave.[4]

The plaintiff also argues that the advertisement is deceptive and confusing because it fails to identify the type of Chinet plate being used. According to the plaintiff, the failure of the advertisement to unambiguously identify the type of Chinet plate being used necessarily implies to

---

[4] Eric Happell, Marketing Director for the Retail Business Unit of Huhtamaki Foodservice, Inc., also contends in his affidavit that the advertisement is misleading because when the spaghetti falls upon the leg and shoe of the model in the advertisement, the model is not burned. According to Mr. Happell, this is inconsistent with the advertisement's representation that the food has been heated in a microwave for 3:30 minutes. However, Mr. Happell fails to realize that this result – at least to the court – seems quite consistent with the fact that the spaghetti was also allowed to cool for 3:20 minutes.

the consumer the message that Dixie plates are stronger than all Chinet plates in all circumstances. Turning to this necessary implication argument first, the court rejects any effort by plaintiff to use this doctrine to establish literal falsity. *See, e.g., Novartis Consumer Health*, 290 F.3d 578, 2002 U.S. App. LEXIS at *12-*13 ("A literally false message may be . . . conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated."); *Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 315 (1st Cir. 2002); *SmithKline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, No. 01-7709, 2001 U.S. App. LEXIS 21472, at *8 (2d Cir. 2001) (noting the use of the necessary implication doctrine by district courts in the circuit, and noting that success on such a claim requires a plaintiff to "show the commercial susceptible to a single, false interpretation."). Simply put, the plaintiff cannot say that the advertisement's failure to identify the type of Chinet plate being used necessarily implies the single conclusion that all Dixie plates are stronger than all Chinet plates.

The court declines, in the absence of evidence to the contrary, to attribute to modern American consumers the level of naivety as apparently would the plaintiff.[5] The plaintiff's own evidence of consumer response contradicts any such claim. According to the compilation of data gathered from the surveys, more than 90 percent of persons surveyed answered YES to the question: "Are you aware that there are different types of disposable plates of different quality, different grades, and different strengths?" More importantly, however, for purposes of the necessary

[5] This observation raises at least two pertinent points. First, the court is hardly qualified to assume the role of television critic. Thus, the court's comments about the aesthetic quality of "Meatball" are likely worth exactly what the reader pays for them, nothing. Second, "Meatball" is, in a word, garish, one might even say vulgar, suggesting that the defendant itself harbor a diminished view to consumer sophistication.

implication doctrine, 23.7 percent of those surveyed answered NO to the question: "Does the AD lead you to conclude that *all* DIXIE plates are stronger than *all* CHINET plates." (emphasis in original). These responses substantiate the court's own conclusion that the advertisement is not susceptible to the single interpretation advanced by the plaintiff.

With respect to the advertisement's alleged instances of deception and confusion, the plaintiff candidly acknowledges that the burden rests with it to show such deception or confusion "by using reliable consumer or market research. It is not for the Court to determine, based solely on some intuitive or visceral reaction whether an advertisement is deceptive. Plaintiff cannot obtain relief simply by arguing how consumers could react, rather, it must show how consumers actually react." *BellSouth Adver. & Publ'g*, 45 F. Supp. 2d at 1321 (citing *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1183 (8th Cir. 1998) (emphasis added); *Johnson & Johnson-Merck Consumer Pharms. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 297-98 (2nd Cir. 1992). The plaintiff contends that it has – through the mall-intercept surveys presently before the court – provided sufficient evidence of how consumers react to Meatball. According to the plaintiff, mall-intercept surveys are routinely used in these types of cases to prove consumer reaction to allegedly deceptive and confusing advertisements. The court does not doubt it. *See, e.g.*, *Novartis Consumer Health*, 290 F.3d 578, 2002 U.S. App. LEXIS 9447, at *26-*31; *cf. Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 225-27 (2d Cir. 1999); *Johnson & Johnson-Merck*, 960 F.2d at 300; *American Home Prods. Corp. v. Johnson & Johnson*, 654 F. Supp. 568, 590 (S.D.N.Y. 1987). Nor does the court doubt the contention of Georgia-Pacific that such surveys are often rejected by district courts. *See, e.g.*, *Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F. Supp. 2d 305, 322-24 (S.D.N.Y. 2000), *aff'd without publ'd opinion*, 234 F.3d 1262 (2d Cir. 2000).

The survey in question was conducted by a survey and marketing research company between June 11-14, 2002. As a part of the survey, the company conducted 529 face-to-face interviews with individuals in select shopping malls across the country. The surveyors selected individuals at random, but compiled results only from individuals who admitted to being responsible for purchasing disposable plates for their household and who had during the course of the previous year purchased disposable plates (1) "whenever we need them"; (2) "somewhat often"; or (3) "very often." Participants answered a total of 7 preliminary questions, and then watched Meatball. Thereafter they answered up to 22 questions, depending upon the response provided, before watching Meatball a second time. Participants then answered a second set of up to 22 questions, and finally received $2.00 for their participation in the survey. Although the plaintiff draws a host of conclusions from the surveys, among those immediately pertinent are (1) 73.3 percent of those surveyed thought the plate was "picked up right away" after heating; (2) 81 percent thought Dixie plates were stronger; and (3) 69.8 percent could not read the super even after viewing the advertisement a second time.[6]

In considering survey evidence, this court must pay special attention to the methodology underlying the survey.

> The evidentiary value of a survey's results rests upon the underlying objectivity of the survey itself. This objectivity, in turn, depends upon many factors, such as whether [the survey] is properly filtered to screen out those who got no message from the advertisement, whether the questions are directed to the real issues, and whether the questions are leading or suggestive.

[6] Many of the statistics go toward the effect the advertisement has upon participants' perception of Chinet. Suffice it is to say that after viewing the advertisement twice, most viewers preferred Dixie plates to Chinet plates.

*Johnson & Johnson-Merck Pharms.*, 960 F.2d at 300. With this in mind, the court concludes that the methodology underlying the survey is flawed, and the survey results unreliable. At the hearing conducted in this action, the parties showed the court several different copies of Meatball. The copy exhibited by the plaintiff was of noticeably poor quality, with the super barely discernible on the screen. Pl. Ex. # 1. Counsel for the plaintiff admitted that this copy was in fact a copy of the copy shown to survey participants. As the court noted during the hearing, the quality of an analog recording is diminished each time a copy is made of that recording. Thus, a third-generation copy of an analog recording (a copy of a copy of a copy of the original) is of poorer quality than a second-generation copy. During the hearing, the defendant showed the court a first-generation copy of Meatball (a copy made from the master tape). That version of the advertisement contained a super readily discernible on screen.[7]

The court has no way of knowing the quality of the advertisement shown to survey participants. If survey participants viewed a version similar to the one exhibited by the defendant, the court would be more inclined to trust the results. If participants viewed a version similar to the one exhibited by the plaintiff, the court would be forced to question whether the survey participants were afforded an opportunity to view the advertisement that reasonably approximated that of an average viewer. That participants viewed a version one generation removed from the one shown by the plaintiff suggests that the participants' inability to see the super was partially influenced by the quality of the advertisement shown them.[8] This necessarily renders the survey suspect.

---

[7]The court presumes here that the version of Meatball being disseminated across the nation's airwaves possesses a quality akin to the tape shown the court by the defendant.

[8]The plaintiff provides the affidavit testimony of William Robert Atchison, the person apparently responsible for the recording of video tapes distributed for survey use and to this court. According to Mr. Atchison, "[t]he copies of the videotape in question are of comparable quality to the original tape that was copied. The

Other methodological flaws weaken the survey as well. As noted in one recent Second Circuit opinion, survey reliability is often measured by considering whether:

> (1) the universe was properly defined, (2) a representative sample of that universe was selected, (3) the questions to be asked of interviewees were framed in a clear, precise and non-leading manner, (4) sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted, (5) the data gathered was accurately reported, (6) the data was analyzed in accordance with accepted statistical principles and (7) the objectivity of the entire process was ensured.

*Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 225 (2d Cir. 1999); *see also Weight Watchers Int'l, Inc. v. Stouffer Corp.*, 744 F. Supp. 1259, 1272 (S.D.N.Y. 1990). In the instant case, the survey and marketing company asked survey participants whether they were responsible for purchasing disposable paper plates and whether they had purchased such plates in the past year. The company did not ask, however, whether the participants intended to purchase such plates in the future. The survey universe is, therefore, too broad, focusing on past behavior as opposed to expected future behavior – the behavior Georgia Pacific presumably seeks to influence and Huhtamaki presumable seeks to prevent. *See American Footwear Corp. v. General Footwear Co.*, 609 F.2d 655, 660 n.4 (2d Cir. 1979); *see also Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 118 (2d Cir. 1984); *see also Weight Watchers Int'l*, 744 F. Supp. at 1272-73. Furthermore, the plaintiff appears to have made little effort to select a representative sample of consumers. More than 90 percent of the participants were female, the largest block (33.1 percent) under 35 years of age. That the mall-intercept surveyors chose not to delineate further within this age bracket causes the court to strongly

---

average viewer cannot detect any difference between the original tape and the copies of the tape . . . ." The court appreciates this testimony and has considered it in rendering its decision. But the fact remains that the tape shown the court was of such poor quality that if it was in fact one generation removed from the tape shown survey participants, the court cannot help but question the quality of the tape shown participants and the results derived therefrom.

question the makeup of that bracket.[9] Simply put, the court is concerned whether nearly one third of the entire response to the survey may represent the opinions of an unknown number of persons under the age of 18. In the absence of more substantial proof supporting the validity of the survey, the court cannot accord it much weight in determining whether the plaintiff has carried its burden in this respect.

Moreover, the remaining evidence submitted leaves the fails short of the mark. The court is aware of the affidavit of Ms. McGee, wherein she states that the video scan lines of the super fail to meet industry standards. The persuasiveness of this affidavit is limited, however, in light of the affidavit testimony of Scott J. Kempler. Mr. Kempler states that the letter height of the super is 22 video scan lines. Mr. Kempler also states that the super appears on screen for 4.33 seconds. The court notes that the plaintiff represented at the hearing that the actual length is approximately 3 to 3.5 seconds. Having reviewed the advertisement *ad nauseam*, the court believes that the duration of the super's screen-time more closely approximates Mr. Kempler's claim. Furthermore, the plaintiff's have submitted only the testimony of Ms. McGee. The defendant directs this court to the fact that the major networks approved the advertisement for use. Although this fact does not establish that the defendant has fashioned an advertisement that passes muster under the Lanham Act, it does reaffirm – in the absence of anything to the contrary – what is likely already apparent from the discussion set forth *supra*: the plaintiff has failed show how consumers are either deceived or confused by the advertisement at issue in this action. Accordingly, the court finds that the plaintiff

---

[9] The court notes that Ms. Davis' supplemental affidavit contains an exhibit that describes, *inter alia*, the survey's targeted market mix. For the age bracket "less than 35" the target was 23 percent. As noted *supra*, the actual number of participants in this bracket was 33.1 percent.

has failed to establish a substantial likelihood of success on the merits of its claim under the Lanham Act.

**C. Irreparable Injury**

The plaintiff also has failed to satisfactorily demonstrate that in the absence of immediate relief it will suffer irreparable injury. At the hearing, the plaintiff maintained that if the court found a substantial likelihood that the advertisement was literally false within the meaning of the Lanham Act, irreparable injury must be presumed. In view of the fact that the plaintiff has not carried it burden to show a substantial likelihood that the plaintiff can prove the advertisement is literally false, Huhtamaki retains its obligation to prove irreparable injury. It has not done so.

> The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies. A showing of irreparable harm is the *sine qua non* of injunctive relief. The injury must be neither remote nor speculative, but actual and imminent. An injury is irreparable only if it cannot be undone through monetary remedies. The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

*Northeastern Fla. Chapter of Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990), *rev'd on other grounds*, 508 U.S. 656 (1993); *see also Siegel v. LePore*, 234 F.3d 1163, 1176-77 (11th Cir. 2000). The plaintiff has made no showing of irreparable injury. All it has done is to make conclusory allegations that its goodwill[10] has been and will be further damaged as

---

[10] The court notes that at the hearing it questioned whether the loss of good will translates into the sort of irreparable injury for which injunctive relief is appropriate. Having reviewed the case law on the subject since that time, the court recognizes that courts often recognize the loss of good will as irreparable. *See, e.g.*, *Centel Cable Television Co. v. Thos. J. White Dev. Corp.*, 902 F.2d 905, 910-11 (11th Cir. 1990) (upholding a district court's findings under the clearly erroneous standard of review). However, the court reminds the plaintiff that allegations and proof are two different things. And in the absence of the latter, the former is an insufficient basis on which the court may act. The court recognizes that proof may often be a difficult thing to come by in the hurried context of a motion for preliminary injunction. In this regard, the following observation seems to offer a prudent means by

a result of the advertisement. The plaintiff has not, however, explained why such damage cannot be remedied through traditional compensatory means. In this regard, the discussion *supra* on the failure of the survey to limit the universe of survey participants to consumers with a present intent to purchase paper plates becomes particularly acute. Assuming *arguendo* reliability, a survey universe limited to such participants with a present intent to purchase readily translates into actual, imminent losses. The court would still be faced with the question of why monetary relief would not remedy such losses, but the court would at least be satisfied that the injuries allegedly being suffered are neither remote nor speculative. See *Northeastern Fla. Chapter*, 896 F.2d at 1285. The plaintiff has not offered such evidence, however, and has therefore failed to carry its burden of proof on the question of irreparable injury.

## V. Conclusion

The court will enter an appropriate order in conformity with this memorandum of opinion.

---

which a court such as this should proceed.

> Where the availability of a product is essential to the life of the business or increases business of the plaintiff beyond sales of that product – for example, by attracting customers who make purchases of other goods while buying the product in question -the damages caused by loss of the product will be far more difficult to quantify than where sales of one of many products is the sole loss. In such cases, injunctive relief is appropriate. This rule is necessary to avoid the unfairness of denying an injunction to a plaintiff on the ground that money damages are available, only to confront the plaintiff at a trial on the merits with the rule that damages must be based on more than speculation. Where the loss of a product with a sales record will not affect other aspects of a business, a plaintiff can generally prove damages on a basis other than speculation. Where the loss of a product will cause the destruction of a business itself or indeterminate losses in other business, the availability of money damages may be a hollow promise and a preliminary injunction appropriate.

*Tom Doherty Assocs. v. Saban Entertainment*, 60 F.3d 27, 38 (2d Cir. 1995).

Done, this 8th of July, 2002.

Edwin Nelson
United States District Judge